Elmer Kirby SMITH, Appellant,

v.

Rose Etta SMITH (now Hall), Appellee.

Court of Appeals or Kentucky.

June 21, 1968.

Virginia Smith, present wife of Elmer Kirby Smith.

Although there were earlier related events, our story starts with the marriage of Elmer and Rose on October 14, 1952. Their daughter, Callie, arrived on May 26, 1955, and Junior was born just a year later. Elmer and Rose separated in May 1957 and Callie and Junior went to live with the Reverend and Mrs. Babb and their two children. On December 13, 1963, Elmer and Rose were divorced by the Henderson Circuit Court, and the permanent custody of the children was awarded to Rose. Elmer was not given the right to visit his children and he was not ordered to support them. He did neither. Elmer married Virginia in May 1964 and learned from her that he had the right to litigate the custody of his children. Virginia had previous experience in these matters for in her divorce proceeding she had been awarded the custody of her two children.

Shortly before Christmas in 1965 Elmer, who lived in Austin, Indiana with Virginia, requested the court to allow him "to visit with and be visited by . * * * Callie * * * on the ground that such action would best serve the welfare of said child." (The record seems to indicate that Junior was living with a family in New Mexico.) Elmer sent a copy of that motion to his former wife at an address in California and to a lawyer "for Mr. and Mrs. Clyde Babb". Rose never appeared although the attorney for the Babbs indicated that he was counsel for "respondents". All resistance came from the Babbs. Because of illness of Elmer's lawyer, there was a delay but on June 17, 1966, a strange "Agreed Order" was entered. It said:

> "This action being before the Court on the motion of the defendant, Elmer Kirby Smith, relative to the infant, Callie Frances Smith, and the parties having agreed by counsel that the defendant, Elmer Kirby Smith, will not seek a change in the orders of the Court heretofore entered relative to custody of said infant except upon the grounds that a change of

Damon A. Vaughn, Madisonville, for appellant.

William Branaman, King, Deep, Branaman & Hunt, Henderson, for appellee.

STEINFELD, Judge.

This is a story which we shall call "Callie's Place." The players, as they appear in this drama of life, are as follows:

Elmer Kirby Smith, former husband of Rose, and Father of Callie Frances Smith.

Rose Etta Smith (now Hall), former wife of Elmer, and Mother of Callie and Elmer Kirby Smith, Jr.

Callie Frances Smith, twelve year old daughter of Elmer and Rose.

Elmer Kirby Smith, Jr., eleven year old son of Elmer and Rose.

Reverend Clyde Babb, husband of Fay Babb.

Fay Babb, wife of Reverend Clyde Babb and sister of Rose.

condition exists relative to the home and conditions of Clybe Babb and Fay Babb, his wife, relative to their custody of said infant;

IT IS NOW ORDERED that the defendant's motion be and the same is continued generally."

Again there was a delay until just after Christmas in 1966 when Elmer moved for an order granting to him "the care, custody, and control of" the "children involved herein". Notice of that motion went to Rose and to the Babbs. The response to the motion requested " * * * that proof * * * be limited to a change of condition relative to the home and conditions of Clyde Babb. and his wife, Fay Babb relative to their custody of the infant, Callie *Babb*." The case proceeded as if the custody of Callie and Junior had been awarded to the Babbs, but it had not.

After Elmer had completed the introduction of evidence the defense pointed out that " * * * there is no evidence * * * with respect to a change in circumstances of the boy * * *, the Court should overrule the movant's motion with respect to the son * * *". Reasoning that the Father, Mother and son were all non-residents the Court refused " * * * to take jurisdiction of this matter as to the boy * * *".

Elmer, Virginia and their witness told the court what good people they were. The Babbs who live in Robards, Kentucky, and their friends stated that the Babb family is "tops". Elmer told of the shortcomings of the Reverend and the Reverend explained why Elmer should not have the custody or even have the company of Callie. The Babbs were requested to leave the court room, and did so before Callie was called to the witness stand. She was asked and answered:

"5. Callie, you understand that Mr. and Mrs. Babb are not in the court room and they can't hear what you have to say?

A. Yes, sir.

6. Callie, are you happy in your home?

A. Yes, sir.

7. Do you love Mr. and Mrs. Babb?

A. Yes, sir, just like a father and mother.

8. Have the Babbs ever tried to influence you against your father?

A. No, sir.

9. Have the Babbs ever told you to send back any letters or send back any presents?

A. No, sir.

10. Was that your idea?

A. Yes, sir.

12. Does it upset you or scare you at the thought of having to maybe change your home?

A. Well, I like where I'm at and I don't want to go any place else.

13. Have you told Elmer and Virginia that?

A. Yes, sir."

*       *       *       *       *       *

Elmer had written a number of letters to Callie which were returned to him unopened. Callie continued:

"15. And you opened a lot of those letters when you went to visit him, didn't you?

A. Yes, sir."

*       *       *       *       *       *

"18. Was there money in some of them?

A. Yes, sir. Virginia told me to take them and buy me gifts and I bought my father a gift for Father's Day, Mr. Babb.

19. You also called Mr. Babb on Father's Day, too, didn't you?

A. Yes, sir, told him I had a gift because I had forgotten to send it."

*       *       *       *       *       *

"47. Do you love your father?

A. Not as much as I love Mr. Babb."

*    *    *    *    *    *

Continuing as to what occurred during her one visit to her Father's home she testified:

"51. Who took you to Bible School when you went to Bible School?

A. He rode me in a truck."

The ruling of the trial court, in part was as follows:

" * * * As to the rights of the father, it occurs to the Court that this father is rather belatedly asserting any rights that he might have in this child; that for all practical purposes there was an abandonment of this child in *1954*, according to the record of the divorce. There was a separation of this husband and wife at the time this child was less than two years of age. And for almost ten consecutive years the father made no provisions for the support of the child, made no efforts to get the child, and didn't see the child but one time during that ten year period. It was only after the father remarried that he began to make any effort to see the child, to support the child, or obtain any custody of the child. As I said, in one of the cases cited by Mr. Vaughn, that the law as of God make the parent the natural protector of his children. But what are we going to do when the parents are not the natural protectors? When they do not assume that obligation as natural protectors of the children? Here were both parents, neither of which assumed the protection of these children. And it was assumed by Mr. and Mrs. Babb. They were willing to take this child into their home and did take this child into their home in infancy. And this child knows of no other home. Knows no other parents. They have done a good job on this child. * * *.

"And then, of course, the Court has considered the desires of the child in this matter. She has shown that she wants to stay where she is; that she does not want to go with her father, and I think it's only natural because since way before she can remember the Babbs for all practical purposes have been her mother and father and it's just natural that she would want to stay with them and prefer them over her natural father. You don't have to have any instructions in the last two years that's been going on for ten years for them to assert any influence over her, it's been going on since she was sixteen or eighteen months old. So I'm going to, the order as it now stands gives the mother the custody, full custody of the child. The motion is to grant the father the custody. There is no motion pending here that the Babbs be given custody of the child, so the only order I'm going to enter here today is to overrule the motion of the father that he be given custody of the child and the child can remain as is. If the child determines in her own mind at a later date that she wants to go with her father then she will have that privilege. When she becomes of the age of accountability she decides that she wants to be adopted by the Babbs and they desire to do that, she can do that."

The motions for custody and visitation rights were overruled. Elmer appeals. His counsel vigorously argues that the trial court erred, and he cites many cases from this and other jurisdictions. However, the welfare of the child is paramount. Brengle v. Hurst, Ky., 408 S.W.2d 418 (1966). In Davis v. Davis, 289 Ky. 618, 159 S.W.2d 999 (1942), this court ruled:

"It is axiomatic that the true guide for the court is the welfare of the child. The dominant thought is that a child is not a chattel to be disposed of according to the wishes of either or both of his parents, but is a human being and personality and is to be treated as such. This rule for disposition of a child is not only directed by the statute, § 2123 but by the dictates of morality and of wisdom born of experience. To that end his custody may be awarded one parent or the other or to his grandparents, or a stranger, according to circumstances."

See Horn v. Dreschel, 298 Ky. 427, 183 S. W.2d 22 (1944), a case in which the custody of a child was at issue between a mother and a couple which was unrelated to the child by blood or marriage ties, wherein we said:

"Where other custodians have nurtured the child from the time the child's memory 'runneth not to the contrary', and conditions are as satisfactory as is disclosed by this. record, one who proposes to change the situation necessarily assumes the burden of proving almost beyond peradventure that the change will promote the welfare of the child; and, unless the change proposed is clearly exhibited to be to the child's best interests, the status should not be disturbed, provided the legal rights of the parties may be preserved."

We have grave doubts with respect to the decision as to visitation rights. Smith v. Smith, 297 Ky. 395, 180 S.W.2d 275 (1944). Callie's Father has shown some interest in her. He wrote letters, sent gifts and has litigated, even through this appellate court his claim for her company. Judicial denial of any association may work to the detriment of the child. However, we said in Gates v. Gates, Ky., 412 S.W.2d 223 (1967):

"With respect to the second contention that the trial court found incorrectly, the law is clear in this jursdiction that the appellate court will not substitute its judgment for that of the trial court unless a manifest abuse of discretion occurred. In Somerville v. Somerville, Ky., 306 S. W.2d 301, we stated: 'When the evidence is conflicting, much weight is given to the Chancellor's decision, and after weighing the evidence, the judgment will be reversed only when we are convinced that he was in error.' The trial court heard and saw the witnesses and is in a better position to evaluate the testimony than is this Court. McCormick v. Lewis, Ky., 328 S.W.2d 415. Upon an examination of the record 'we are not convinced that he was in error', and we are not convinced that he abused his discretion. Newby v. Newby, Ky., 275 S.W.2d 779. As always,

the welfare of the children is paramount. Brengle v. Hurst, Ky., 408 S.W.2d 418. Not being convinced that the trial court was in error we cannot and will not substitute our decision for the judgment of the trial court when the evidence is as conflicting as is indicated by the record in this case. Renfro v. Renfro, Ky., 291 S.W.2d 46."

We rely on the trial court to again carefully consider the matter of visitation when and if it is later presented.

 Yes, this is a tragedy, but in due time Callie will learn that there is love and affection for little girls and that judges are always ready to give their time and careful consideration to the welfare of each one without regard to riches, color, religion or status—only because they are little girls. We find nothing to indicate that the trial court erred in determining Callie's place.

The judgment is affirmed.

All concur.